UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HILARY BAILEY,

                                    Plaintiff,

                    v.

MOUNT VERNON CITY SCHOOL
DISTRICT, *et al.*,

                                    Defendants.

No. 17-CV-9973 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Matthew Brian Weinick, Esq.
Famighetti & Weinick, PLLC
Melville, NY
*Counsel for Plaintiff*

Gerald Stephen Smith, Jr., Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Hilary Bailey ("Plaintiff") brings this Action, pursuant to 42 U.S.C. § 1983 and

the First and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12111, *et seq.*, and New York State law, against the Mount Vernon School District ("the

District"), and two of its senior employees, Charles Brown ("C. Brown") and Jonathan Brown

("J. Brown"), (collectively, "Defendants"), alleging that Defendants discriminated against him

based on his disability, failed to accommodate that disability, and retaliated against him for his

protected complaints about working in a classroom with mold.

Before the Court is Defendants' Motion for Summary Judgment (the "Motion"). (Defs.'

Not. of Mot. ("Not. of Mot.") (Dkt. No. 38).)  For the following reasons, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Local Rule 56.1 Statement in Supp. of Mot. ("Defs.' 56.1") (Dkt. No. 39)), Plaintiff's statement pursuant to Local Civil Rule 56.1, (Pl.'s Local Rule 56.1 Statement in Opp'n to Mot. ("Pl.'s 56.1") (Dkt. No. 45)), and the admissible evidence submitted by the Parties.[1] The Court recounts only those facts necessary for consideration of the instant Motion.

#### 1. Plaintiff's Initial Employment

Plaintiff began his employment as a math teacher with the District in the 2000-2001 school year. (Defs.' 56.1 ¶¶ 1, 31.) Plaintiff's job responsibilities included not only instruction, but also related functions, including "demonstrating effective classroom management"; "appropriately communicating with" students, colleagues, and parents; use of certain performance assessments; participating in professional development; and maintaining accurate records. (*Id.* ¶ 2.)

During his years of employment by the District, Plaintiff was involved in several disciplinary incidents. For example, on June 16, 2010, Plaintiff's then-principal, Brodrick

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). Where possible, the Court relies on the facts as presented in the Parties' statements of fact. However, direct citations to the record are used where the Parties' statements of fact do not include relevant facts or do not accurately characterize the record.

Spencer ("Spencer") sent Plaintiff a memorandum stating that Plaintiff had refused to attend a meeting, and warning that Plaintiff's actions "could result in a charge of insubordination." (Decl. of Gerald. S. Smith, Esq. in Supp. of Mot. ("Smith Decl.") Ex. H 2 (Dkt. No. 40-8).) Over a week later, Plaintiff responded to Spencer denying his accusations. (*Id.*) Thereafter, from March through May of 2011, Spencer sent Plaintiff several additional memoranda, noting specific failures in Plaintiff's instruction, classroom management, collegiality, and record-keeping. (*Id.* at 3–9.)

In 2013, J. Brown was appointed principal of Longfellow Middle School, now known as Benjamin Turner Middle School, and began supervising Plaintiff. (Defs.' 56.1 ¶¶ 3–4.) By the conclusion of a year in his role, J. Brown developed concerns regarding Plaintiff's students' understanding of the concepts taught by Plaintiff as well as "some concerns" about Plaintiff's consistency in managing his classroom. (*Id.* ¶ 5; Pl.'s 56.1 ¶ 5.) In the fall of 2014, J. Brown's concerns increased, largely based on his impression during a classroom visit that "students were not engaged in instruction, including sitting in one another's laps, [and] using their cell phones in violation of the school's policy." (Defs.' 56.1 ¶¶ 7–8.) J. Brown also believed that Plaintiff was "defensive and argumentative and unwilling to acknowledge the concerns when they were discussed." (*Id.* ¶ 9.) J. Brown's concerns also increased as "Plaintiff's classroom management," his students' performance, and Plaintiff's relationships with students and colleagues continued to be unsatisfactory. (*Id.* ¶ 11.) J. Brown discussed with colleagues the "most appropriate way in which to handle" Plaintiff's workplace issues, but he does not recall when the possibility of formal disciplinary charges against Plaintiff were first discussed. (Smith Decl. Ex. D ("J. Brown Dep.") 16–17 (Dkt. No. 40-4).)

<u>2. Plaintiff's Annual Assessments from 2013-2016</u>

The District is required to conduct performance evaluations of instructors in accordance with the New York State Annual Professional Performance Review ("APPR") statute and corresponding regulations. (Defs.' 56.1 ¶ 14.) Based on the APPR, teachers are assigned a score of "H-Highly Effective; E-Effective; D-Developing; or I-Ineffective." (*Id.* ¶ 21.) Teachers who are rated either "D" or "I" are required to participate in a "teacher improvement plan" ("TIP") to address their specific weaknesses. (*Id.* ¶ 22.) In the 2013-2014 school year, Plaintiff initially received an "I" rating, but after appeal to the Superintendent, received a "D" rating. (*Id.* ¶ 32; Pl.'s 56.1 ¶ 32; Smith Decl. Exs. I, L (Dkt. Nos. 40-9, 40-12).) Based upon that "D" rating, Plaintiff was placed in a TIP for the 2014-2015 school year. (Defs.' 56.1 ¶ 36.) In keeping with that TIP, J. Brown expected Plaintiff to produce lesson plans, encourage student laptop use, and improve his understanding of how to assess students. (*Id.* ¶¶ 41–43.)

In January 2015, J. Brown provided Plaintiff with a "letter of counsel" laying out several areas of concern, including "a failure to submit lesson plans on a timely basis, a failure to properly report absences, deficient tutoring practices, a history of threatening and challenging administrators," and general concerns regarding Plaintiff's "professionalism," "judgment," and "ability to provide an appropriate environment for students." (*Id.* ¶ 44.) The letter also advised Plaintiff that failure to show improvement "may result in a recommendation to the department of human resources to pursue disciplinary action that may lead to your termination." (*Id.* ¶ 45.) Nevertheless, Plaintiff did not comply with certain requirements of his TIP, specifically in that he failed "to have lesson plans available and regularly was unable to provide lesson plans during visit[s] to his classroom." (*Id.* ¶ 47.) At the close of the 2014-2015 school year, Plaintiff again initially received an "I" rating, but appealed, noting that the rating had resulted from an error in

adding elements of the composite score; once again, Plaintiff ultimately received a "D" rating. (Pl.'s 56.1 ¶ 49; Smith Decl. Exs. D 18–20, O (Dkt. Nos. 40-4, 40-15).)  Based on this rating, Plaintiff was again placed on a TIP for the 2015-2016 school year.  (Defs.' 56.1 ¶¶ 54, 76.)  The development of this TIP was facilitated by Marilyn Anderson, an assistant principal and Plaintiff's direct supervisor at the time.  (*Id.* ¶¶ 77–78.)  The 2015-2016 TIP focused on similar areas to that of Plaintiff's previous TIP because Plaintiff "did not demonstrate the expected outcomes" with respect to the previous year's TIP.  (*Id.* ¶¶ 79–80.)

On September 1, 2016, Plaintiff once again received a "D" rating for the 2015-2016 school year.  (*Id.* ¶¶ 81–82.)  Plaintiff's ratings over the course of these three years were, in part, a product of classroom observations conducted by several senior school officials other than J. Brown.  (*See id.* ¶¶ 55, 84, 88.)

Plaintiff was again placed in a TIP for the 2016-2017 school year.  (*Id.* ¶ 97.)  The TIP was facilitated by C. Brown, an assistant principal newly assigned to Plaintiff's school and Plaintiff's direct supervisor during the 2016-2017 school year.  (*Id.* ¶ 98.)  C. Brown provided an initial proposed TIP to Plaintiff and his union representative, Greg Vandecarr ("Vandecarr"), but Plaintiff rejected C. Brown's proposal and countered with a far less demanding proposal.  (*Id.* ¶¶ 104–05.)  Nevertheless, C. Brown agreed to Plaintiff's proposed TIP.  (*Id.*)  On November 4, 2016, at the first quarterly "check-in" for this TIP, Plaintiff failed to submit any of the information and documentation required by the TIP he himself created.  (*Id.* ¶ 111.)  C. Brown provided Plaintiff several additional months to complete his TIP-required assignments, but at the next check-in on January 26, 2017, Plaintiff again failed to produce the promised materials.  (*Id.* ¶¶ 112–13; Smith Decl. Ex. G ("§ 3020-a Testimony Excerpts") 1122–24 (Dkt. No. 40-7).)  As a result of these repeated failures, C. Brown issued Plaintiff a counseling memorandum.  (Pl.'s

56.1 ¶ 114; § 3020-a Testimony Excerpts 1125.)  Accordingly, by February 2017, C. Brown had come to believe that Plaintiff was "struggling and not working on growing" as a teacher.  (*Id.* ¶ 100–01.)

### 3.  Plaintiff's Assignment to Room 415

In May 2016, Plaintiff was assigned to Room 415.  (Smith Decl. Ex. E ("C. Brown Dep.") 36 (Dkt. No. 40-5).)  Because Plaintiff was one of approximately five teachers who taught smaller classes, and because Room 415 was "a little smaller" than other classrooms, Room 415 was considered a suitable classroom for Plaintiff.  (Pl.'s 56.1 ¶ 119; C. Brown Dep. 36–38.)  In November 2016, Plaintiff first noticed respiratory symptoms.  (Pl.'s 56.1 ¶ 122.)  On December 16, 2016, Plaintiff sent an email to C. Brown and Michael Pelliccio ("Pelliccio"), the District Superintendent of Buildings and Grounds, expressing concern about watermarks in the room, noting a "change in [Plaintiff's] health, which is respiratory problem," and stating that the issue "appears to be a health issue for staff and students."  (Smith Decl. Ex. BB (Dkt. No. 40-28).)  The email did not, however, mention mold or request a transfer of classrooms.  (*Id.*; *see also* Pl.'s 56.1 ¶¶ 126–27; Smith Decl. Ex. C ("Pl. Dep.") 19–22 (Dkt. No. 40-3).)  In addition to Pelliccio and C. Brown, the email was also sent to several others, including Plaintiff's union representatives and an additional assistant principal.  (Pl.'s 56.1 ¶ 125.)

On December 20, 2016, Plaintiff sent an additional email to C. Brown stating that he had "been experiencing serious health issues which [he] believe[s] are caused by the respiratory conditions of [his] teaching room of 415," and requesting a transfer to a different classroom "[u]ntil this issue can be resolved."  (Smith Decl. Ex. CC (Dkt. No. 40-29).)  Plaintiff also explained that the issue had caused his absence that day as well as four days earlier.  (*Id.*)  Plaintiff also stated that "[d]epending on my doctor's advice, I hope to return to work tomorrow

with a medical note." (*Id.*)  On December 21, 2016, Plaintiff provided a note from a physician indicating that Plaintiff had an allergic reaction to mold, was highly allergic to "aspergillus" mold, and that Plaintiff therefore could not work near mold.  (Pl.'s 56.1 ¶ 130.)  However, neither that note nor any other medical documentation mentioned conditions in Plaintiff's classroom or expressly indicated that that he required a change in classrooms.  (*Id.* ¶ 129.)  At the time, all classrooms in the building were in use by other teachers.  (*Id.* ¶ 123.)

Within days, the District retained a company, Niche Analysis ("Niche"), to perform indoor air quality testing in the school.  (*Id.* ¶ 131.)  On December 28, 2016, after "investigat[ing the] general environmental conditions inside classroom 415 in an attempt to determine whether those conditions are related to occupant complaints," Niche prepared a report concluding: "airborne indoor mold levels of all samples were low and within acceptable . . . guidelines. Indoor mold is also qualitatively similar to outdoor mold.  Indoor mold is not an environmental concern during the course of this survey."  (*Id.* ¶¶ 132–34; Smith Decl. Ex. EE 2, 6 (Dkt. No. 40-31).)  Plaintiff was then provided a copy of Niche's test results.  (Pl.'s 56.1 ¶ 135.)  Plaintiff reviewed the results, and provided them to his doctor, who did not question the results.  (*Id.* ¶¶ 136–39.)

At some point after the test, because Plaintiff continued to feel sick and had not received a classroom transfer, Plaintiff began making arrangements with other teachers to use their classrooms.  (Pl.'s Dep. 30; Pl.'s 56.1 ¶ 140.)  On January 3, 2017, Pelliccio sent an email to J. Brown indicating that based on the testing results and a physical review of the classroom, it was his recommendation that "all normal activity be resumed in classroom 415."  (*Id.* ¶ 142.)  In mid-January, C. Brown instructed Plaintiff to return to his classroom, but Plaintiff responded that he was still experiencing the same symptoms, had sent the Niche testing report to his doctor, would

arrange for an independent air quality test to be conducted, and would report to the classroom only "after necessary adjustments had been made." (*Id.* ¶¶ 143–44.) Plaintiff also emailed the District Superintendent indicating that, despite the test results, he believed the room represented a safety issue for all staff and students. (*Id.* ¶ 145.)

Following those emails, Plaintiff was provided with a temporary schedule that allowed him to teach in different classrooms. (*Id.* ¶ 147.) During this period, C. Brown discussed with supervisors how to respond should Plaintiff refuse to return to Room 415 when directed to do so. (*Id.* ¶ 149.) Plaintiff initially refused to comply with his temporary schedule (which no longer assigned Plaintiff to Room 415), explaining that the scheduled rooms were too far away, and instead continued to teach in classrooms of his own choosing. (*Id.* ¶¶ 151–52.) On February 3, 2017, C. Brown instructed Plaintiff to comply with the schedule he had been provided. (*Id.* ¶ 153.) Additionally, the District hired another vendor to conduct a second air quality evaluation, and on January 31, 2017, the vendor produced a report concluding that "fresh air supply was excellent," that conditions were "not conducive to supporting abnormal mold growth," and that airborne mold levels were "lower than outdoor mold levels" and "considered normal." (Smith Decl. Ex. LL ("Second Air Report") 2, 6 (Dkt. No. 40-38).) The report also specifically concluded that there were low levels "Aspergillus/Penicillium-like spores." (*Id.*)

Following the second air quality test, and after consulting with an attorney for the District, on February 13, 2017, C. Brown met with Plaintiff and his union representative and directed Plaintiff to return to his assigned classroom. (Pl.'s 56.1 ¶¶ 163, 183.) However, Plaintiff continued teaching in other classrooms of his own choosing, and on February 16, 2017, C. Brown issued a letter to Plaintiff reiterating the directive, stating that he did not believe Plaintiff had a "legitimate and/or rational basis" for his refusal, and warning that he would

recommend disciplinary action if Plaintiff continued to refuse." (Smith Decl. Ex. PP (Dkt. No. 40-42); Pl.'s 56.1 ¶¶ 185–86.) C. Brown never spoke directly to the Superintendent about bringing disciplinary charges against Plaintiff. (Pl.'s 56.1 ¶ 190.) The same day, Plaintiff filed an EEOC Complaint alleging age discrimination; however, that complaint was not received by the District until February 22, 2017. (*Id.* ¶ 196.)

In a February 17, 2017 email, Plaintiff informed C. Brown that he had sent the test results to his medical specialist for evaluation, and that the specialist would fax his advice. (Smith Decl. Ex. RR (Dkt. No. 40-44).) On February 17, 2017, the specialist faxed a two-sentence evaluation to the school, stating that Plaintiff "has a diagnosis of [b]ronchial [a]sthma which is exacerbated by mold spore exposure," and that Plaintiff "should avoid all contact with this trigger of his asthma." (Smith Decl. Ex. SS (Dkt. No. 40-45); Pl.'s 56.1 ¶ 170.) Although the specialist had been provided a copy of the test results concerning Room 415, the letter did not specifically reference Room 415 or classroom arrangements. (Pl.'s 56.1 ¶¶ 171–72.) Throughout this time, Plaintiff continued to teach his classes in other classrooms of his own choosing. (*Id.* ¶ 192.)

While Plaintiff maintains that "there is no reason" why Defendants could not have extended the alternative schedule, C. Brown attests that extending the alternative schedule created a burden, requiring additional work by custodians, displacing other teachers, and costing valuable instruction time due to the need for teacher set-up. (*Id.* ¶¶ 179–80.)

On March 7, 2017, J. Brown issued a letter reiterating the directive that Plaintiff return to Room 415. (*Id.* ¶ 191.) On March 9, 2017, Plaintiff was informed that he had been administratively reassigned to home with full pay and benefits pending a meeting with District and union representatives. (*Id.* ¶ 193.) On March 17, 2017, after the process of bringing

disciplinary charges against Plaintiff was already underway, Plaintiff filed an EEOC complaint alleging violations of his rights under the ADA. (*Id.* ¶ 195.)

### 3. Plaintiff's § 3020-a Charges

Under New York State Education Law § 3020-a and accompanying regulations, the District Superintendent is empowered to recommend to the District's Board of Education ("the Board") that it pursue charges and seek termination of an employee. (*Id.* ¶ 197.) The Board approves charges if, after hearing evidence presented by District Counsel, it determines that the evidence is sufficient to support the charges. (*Id.* ¶ 198.) The § 3020-a process is often lengthy and costly, and so the District does not recommend charges lightly. (*Id.* ¶¶ 199–202.) The § 3020-a process also requires that the District permit the employee to address and improve upon areas of concern, including through use of a several TIPs. (*Id.* ¶¶ 204–06.)

Dr. Kenneth Hamilton ("Hamilton"), the District's Superintendent, had been made aware of "significant concerns" regarding Plaintiff, including student performance, episodes of insubordination, disruption, and resistance to efforts at assisting him in improving his instruction. (*Id.* ¶¶ 207–08; Smith Decl. Ex. AA ("Hamilton Decl.") ¶¶ 6–7 (Dkt. No. 40-27).) Hamilton attests that his decision to pursue disciplinary charges against Plaintiff was "based on ongoing concerns regarding Plaintiff's performance and his demonstrated refusal to acknowledge these issues and accept guidance and assistance." (Hamilton Decl. ¶ 11.) Hamilton further attests that charges were "also recommended based upon various instances of insubordinate behavior," but that he would have recommended pursuing Plaintiff's termination "[e]ven if individual acts of insubordination had not been included among" the charges. (*Id.* ¶¶ 12–13.) By contrast, Plaintiff argues that the Board's decision to charge him was based on his refusal (or inability) to work in Room 415. (Pl.'s 56.1 ¶ 210.) In particular, Plaintiff points to deposition testimony

from a Board member recalling "this had something to do with [Plaintiff] being insubordinate and him moving his classroom without authorization. I remember there was a discussion about students not being able to find their classes basically." (Decl. Smith Ex. F ("McOwen Dep.") 12 (Dkt. No. 40-6).) Although the Board member emphasized that he barely recalled Plaintiff's case, he acknowledged that his recollection was that Plaintiff's insubordination concerning the classroom, and its effect on students, was "at least one basis" for its decision and was the "main thrust" of the charges against Plaintiff. (*Id.*) On April 18, 2017, the Board adopted the proposed charges. (Pl.'s 56.1 ¶ 212.)

Plaintiff's § 3020-a hearing (the "§ 3020-a Hearing") began on June 19, 2017 and took place over the course of 16 days during which the parties had the opportunity to introduce evidence and arguments in support of their positions. (*Id.* ¶ 215.) During the hearing, Plaintiff argued that the charges were "a case of retaliation, purely and simply, by Principal Jonathan Brown against [Plaintiff] for several well documented events, including the exposure of environment hazards in [Plaintiff's] classroom." (*Id.* ¶ 216.) Plaintiff also produced several witnesses, one of whom testified that Plaintiff was "a target" of J. Brown's because of Plaintiff's defense of the teachers' union prerogatives and opposition to J. Brown's "transformative" approach as principal. (*Id.* ¶ 217; § 3020-a Testimony Excerpts 1488–90.)

On June 13, 2018, the assigned Hearing Officer rendered a 233-page decision, finding Plaintiff guilty of twenty-six of the forty charges brought against him. (*Id.* ¶¶ 218–19; *see also* Smith Decl. Exs. XX-1, XX-2, and XX-3 (collectively, "§ 3020-a Decision") (Dkt. Nos. 40-50–40-52).)[2] Of these 40 charges, only the first three relate to Plaintiff's refusal to Room 415. (*See*

---

[2] When citing to the § 3020-a Decision, the Court refers to the page number of the original decision itself, rather than the ECF page stamp.

§ 3020-a Decision 6–30 (summarizing charges).)  With respect to the first three charges, the

Hearing Officer found Plaintiff guilty of insubordination for "willfully refus[ing] to obey" three

direct and clear orders from supervisors "to resume use of his assigned classroom."  (*Id.* at 56,

62.)  Similarly, the Hearing Officer found Plaintiff guilty of misconduct under the second charge,

"disrupt[ing] and/or negatively impact[ing] the educational process for students," because

Plaintiff's unilateral changing of rooms resulted in student confusion and lost instructional time.

(*Id.* at 67–70.)  However, the Hearing Officer found that the record was insufficient to prove that

Plaintiff's conduct with respect to room assignments "endangered" student safety, or "negatively

impacted the ability of other staff members to perform their professional responsibilities."  (*Id.* at

70–72.)  Accordingly, Plaintiff was found only partially guilty of the second charge, and not

guilty of the third charge.  (*Id.*)

In finding Plaintiff guilty of insubordination for the first charge, the Hearing Officer

recognized an "exception" to the obligation to obey directives where obedience would present a

"serious health hazard to the employee or to others."  (*Id.* at 61–62.)  However, the Hearing

Officer concluded that "[t]he preponderance of evidence establishes no indoor mold hazard

existed in Room 415," and that "the evidence does not prove Respondent was endangered by

being in Room 415."  (*Id.* at 62.)  The Hearing Officer further concluded that Plaintiff's letter

from a specialist indicating that Plaintiff "cannot work near mold" was sufficient to warrant the

testing of Room 415, but did not suggest that Plaintiff was endangered by Room 415 in light of

the test results.  (*Id.* at 63.)  In particular, the Hearing Officer noted that the specialist's note

"does not address the low volume of fungal mold spores found in the room, nor whether those

low levels would pose a danger to [Plaintiff's] health," and that Plaintiff "told the District his

doctors were reviewing the air quality reports."  (*Id.*)  The Hearing Officer therefore explained

that "[i]t is reasonable to infer had [the doctors] found the indoor test results or conclusions . . . problematic for [Plaintiff's] health, medical evidence would have been brought forward to support that contention. It was not." (*Id.*) Accordingly, and after analyzing the test reports in detail, the Hearing Officer concluded that while Plaintiff "may well have had symptoms in December of 2016 that were concerning for him," and "may also have believed those symptoms were possibly caused by the condition of his classroom," any such belief was "not reasonable." (*Id.* at 65.)

The Hearing Officer also "reject[ed]" Plaintiff's argument that he was "charged in this proceeding in retaliation for having raised concerns about environmental hazards in his classroom." (*Id.* at 65.) The Hearing Officer explained that there was "no evidence to support that argument." (*Id.*) Indeed, the Hearing Officer expressly concluded that "[i]t was Plaintiff's insubordination . . . that led to his being charged, not his having raised concerns about a penitential environmental hazard." (*Id.*)

Moreover, the Hearing Officer found Plaintiff guilty of dozens of charges unrelated to the conflict over Room 415, including: failing to timely report an allegation or suspicion of child abuse; engaging in disruptive behavior during faculty meetings; attempting to undermine the authority of the principal; multiple incidents of insubordinate and unprofessional conduct toward multiple supervisors; refusing to provide required after-school help and tutorials; refusing to engage in appropriate classroom management techniques; failing to adhere to protocol for requesting leave time; failing to submit student learning objectives or student assessments; failing to prepare required lesson or appropriate work for students; failing to participate in necessary training programs; leaving students unattended and without supervision; and general incompetence and misconduct, including with respect to his successive TIPs for 2013-2017.

(Pl.'s 56.1 ¶¶ 228–51.)  The Hearing Officer therefore concluded that evidence clearly established that Plaintiff "was not effective and did not provide a valid educational experience because, by objective measurement, he did not bring about his student's growth and they did not learn the content of his curriculum."  (*Id*. ¶ 252.)  In sum, the Hearing Officer explained, "[t]he conclusion is inescapable [Plaintiff] was not competent as a teacher."  (*Id.* ¶ 253.)

On December 17, 2018 Plaintiff appealed the Hearing Officer's decision to the State Supreme Court, Westchester County under Article 78.  (*Id.* ¶ 256.)  In that appeal, Plaintiff argued that the charges were retaliation for his "protected speech" in opposing J. Brown and reporting incidents of misconduct by J. Brown.  (*See* Smith Decl. Ex. YY ("Pl.'s Appeal") ¶¶ 21–31 (Dkt. No. 40-53).)  Plaintiff emphasized that his claims of retaliation were "at the heart" of his defense and cited to the numerous ways in which purported evidence of retaliation had been presented during the hearing.  (*Id.* ¶¶ 29–31; Pl.'s 56.1 ¶ 257.)  On January 14, 2019, the State Supreme Court issued a decision upholding the findings and decision of the Hearing Officer in their entirety.  (*Id.* ¶ 258.)  In doing so, the State Supreme Court specifically rejected Plaintiff's contention that the Hearing Officer had failed to properly consider the issue of retaliation.  (*See* Smith Decl. Ex. AAA ("Supreme Court Decision") 3–6 ("Contrary to Petitioner's contention, the Hearing Officer did adequately address and reject the merits of Petitioner's retaliation defense.") (Dkt. No. 40-55).)

B.  Procedural Background

On December 21, 2017, Plaintiff filed his Complaint.  (Compl. (Dkt. No. 1).)  On March 5, 2018, Defendants filed an Answer.  (Dkt. No. 16.)  Pursuant to a schedule adopted by the Court at a Pre-Motion Conference held on May 29, 2019, (Dkt. No. 37), Defendants filed the instant Motion and accompanying papers on July 19, 2019, (*see* Not. of Mot; Defs.' 56.1; Smith

Decl.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 41)). On August 29, 2019, Plaintiff filed his Opposition. (Pl.'s 56.1; Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 43); Decl. of Matthew Wernick, Esq. ("Wernick Decl.") (Dkt. No. 44).) On September 46, 2019, Defendants filed their Reply. (Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 46).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary

judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the

statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

### B. Analysis

Defendants argue that Plaintiff's claims are subject to collateral estoppel; that Plaintiff's First Amendment retaliation claims fail because Plaintiff spoke as an employee rather than as a citizen; that Plaintiff has not established a causal relationship between his speech and the disciplinary charges; that Plaintiff never provided adequate medical support for his need to move classrooms; that Defendants accommodated Plaintiff insofar as was reasonable; and that Plaintiff cannot produce evidence linking his complaints about Room 415 to his termination. (*See generally* Defs. Mem.) The Court addresses these arguments only insofar as necessary to resolve the instant Motion

#### 1. Collateral Estoppel Generally

"The Full Faith and Credit Act, 28 U.S.C. § 1738, . . . requires the federal court to give the same preclusive effect to a state-court judgment as another court of that State would give." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (citation and quotation marks omitted); *see also LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002) ("A federal court must apply the collateral estoppel rules of the state that rendered a prior judgment on the same issues currently before the court . . . ."). In this case, New York is the relevant state, as Defendants contend that a New York state court and administrative decisions bar Plaintiff's claims. *See Colon v. Coughlin*, 58 F.3d 865, 869 n.2 (2d Cir. 1995) ("We . . . look to New York law to determine the effect of [the plaintiff]'s Article 78 proceeding."). "Under New York law, collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an

issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same." *LaFleur*, 300 F.3d at 271 (alteration in original) (citation and quotation marks omitted). "When it applies, collateral estoppel divests a federal district court of subject matter jurisdiction over the precluded issue." *Sank v. City Univ. of N.Y.*, No. 10-CV-4975, 2011 WL 5120668, at *3 (S.D.N.Y. Oct. 28, 2011) (citation omitted). "New York courts will give administrative determinations preclusive effect if made in a quasi-judicial capacity and with a full and fair opportunity to litigate the issue." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 312 (2d Cir. 2005) (citation omitted). Moreover, it is well-settled that a "[§] 3020-a hearing is an administrative adjudication that must be given preclusive effect" when the elements of collateral estoppel are satisfied. *Id.* at 311–12; *see also Washington v. N. Y. C. Dep't of Educ.*, 740 F. App'x 730, 733 (2d Cir. 2018) ("Collateral estoppel, also termed issue preclusion, applies to administrative adjudications, including [§] 3020–a hearings." (citation and quotation marks omitted)).

Courts apply the doctrine of collateral estoppel "if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon*, 58 F.3d at 869 (citations omitted); *see also Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 94 (2d Cir. 2005) (same). It must be "quite clear that these requirements have been satisfied, lest a party be precluded from obtaining at least one full hearing on his or her claim." *Colon*, 58 F.3d at 869 (citation and quotation marks omitted). Thus, "[t]he party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Id.* (citation omitted). However, "[t]he doctrine

of collateral estoppel 'is grounded on concepts of fairness and should not be rigidly or mechanically applied.'" *LaFleur*, 300 F.3d at 271 (quoting *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990)).

### 2. Application

Here, the doctrine of collateral estoppel precludes this Court's consideration of the merits of any of Plaintiff's claims. This is so because the Hearing Officer in Plaintiff's § 3020-a Hearing clearly decided, against Plaintiff, issues identical to those Plaintiff now seeks to place before this Court.

### a. ADA Failure to Accommodate

"Discrimination in violation of the ADA includes, inter alia, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McBride v. BIC Consumer Prods. Mfg. Co*., 583 F.3d 92, 96 (2d Cir. 2009) (italics omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)). As defined by statute, a "reasonable accommodation" includes efforts to make facilities and work assignments "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12111(9). The Second Circuit has further explained that "the ADA contemplates that employers will engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (citation, alteration, and quotation marks omitted). This obligation exists when a plaintiff makes his employer aware, or when it is obvious, that "an accommodation is needed." *Id.* (citation omitted). Accordingly, courts have held that an element of an ADA "reasonable accommodation" claim is that such a reasonable accommodation is "needed," i.e., that "a causal relationship existed between the disability and the request for accommodation." *Scalera v.*

*Electrograph Sys., Inc*., 848 F. Supp. 2d 352, 367 (E.D.N.Y. 2012) (citation and quotation marks omitted); *see also Delores Williams v. Anne Geiger & Dep't of Educ.*, —F. Supp. 3d—, 2020 WL 1304397, at *10 (S.D.N.Y. Mar. 19, 2020) ("[T]here must be some sort of causal connection between the [p]laintiff's disability and the requested accommodation." (citation and quotation marks omitted)).

Here, the § 3020-a Hearing Officer conclusively determined that there was no such causal relationship. Indeed, the Hearing Officer found that "[t]he preponderance of evidence establishes no indoor mold hazard existed in Room 415," and that "the evidence does not prove Respondent was endangered by being in Room 415." (§ 3020-a Decision 62.) The Hearing Officer further concluded that while Plaintiff "may well have had symptoms in December of 2016 that were concerning for him," and "may also have believed those symptoms were possibly caused by the condition of his classroom," but that any such belief was "not reasonable." (*Id.* at 65.) In other words, the Hearing Officer conclusively found that Plaintiff had no factual basis to claim that Room 415 was affecting his health, and hence, that Plaintiff's belief to the contrary was objectively unreasonable. Moreover, these findings of fact and law, were explicit components of the Hearing Officer's ultimate determination that Plaintiff's refusal to obey directives was unjustified. (*See id.* (explaining "no evidence was presented to prove the room was triggering his symptoms," and that "[w]ithout such evidence, [Plaintiff's] refusal to resume use of Room 415 was an act of disobedience").) Accordingly, the factual basis for Plaintiff's instant ADA claim—that there was some causal connection between his request and his disability—was "properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Julien v. Venditty*, No. 18-CV-3055, 2020 WL 902921, at *4 (E.D.N.Y. Feb. 25, 2020) (citation and quotation marks omitted). Plaintiff's failure to

accommodate claim is therefore "barred by collateral estoppel" and dismissed.  *McGriff v. Keyser*, No. 17-CV-8619, 2019 WL 1417126, at *6 (S.D.N.Y. Mar. 29, 2019) (collecting cases).[3]

b.  Retaliation Claims

Although Plaintiff advances several retaliation clams under distinct legal theories, the legal framework governing each of these claims is substantially similar.  In particular, Plaintiff pursues retaliation claims under the First Amendment (pursuant to § 1983), the Fourteenth Amendment (pursuant to § 1983), and under the ADA.  (*See* Compl. ¶¶ 122–136.)[4]  All three species of claim require certain shared elements: (1) "plaintiff was engaged in protected activity;" (2) "an adverse decision or course of action was taken against plaintiff;" and (3) "a causal connection exists between the protected activity and the adverse action."  *Weixel v. Bd. of Educ. of City of N. Y.*, 287 F.3d 138, 148 (2d Cir. 2002) (citation and quotation marks omitted) (describing the standard for ADA retaliation claims); *see also Vega v. Hempstead Union Free*

---

[3] The Court thereby dismisses Plaintiff's third and fourth causes of action.  (*See* Compl. ¶¶ 126–27.)  Although the Complaint asserts distinct causes of action for "disability discrimination" and "failure to accommodate" under the ADA, (*see* Compl. ¶¶ 126–27), nothing in the record or briefing indicates that Plaintiff's "discrimination" claim is distinguishable from his "failure to accommodate" claim.  Indeed, a failure to accommodate is a form of disability discrimination.  *See Williams v. N. Y. C. Dep't of Health & Mental Hygiene*, 299 F. Supp. 3d 418, 425 (S.D.N.Y. 2018) (explaining that "'discrimination' under the ADA includes a failure to provide an employee with a reasonable accommodation for his or her disability" (citation omitted)).  Here, Plaintiff alleges no discriminatory animus, and a failure to accommodate is thus the *only* form of discrimination that Plaintiff's allegations conceivably support.

[4] It is not clear whether Plaintiff is pursuing retaliation claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1).  Although such a claim is included in Plaintiff's Complaint as the ninth cause of action, (*see* Compl. ¶ 132), Plaintiff has acknowledged that he is "not pursuing his claims of age discrimination," (Pl.'s Mem. 2 n.1).  However, insofar as Plaintiff intended to waive only his age discrimination claim, but not the accompanying retaliation claim, the same analysis applies to that claim as well.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–77 (2009) (requiring "but-for" causation in ADEA claims).

21

*Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (explaining that a retaliation claim based on an equal protection violation under § 1983 requires similar elements); *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (explaining that similar standards apply to First Amendment retaliation claims).

Here, the existence of adverse employment actions—Plaintiff's disciplinary charges leading to his termination—are not in dispute. Rather the Parties dispute (1) whether Plaintiff's complaints about Room 415 and his unilateral decision to teach in other classrooms constitute "protected activity" under the relevant law (i.e., ADA, the First Amendment, or the Fourteenth Amendment's guarantee of equal protection); and (2) whether a sufficient "causal connection" exists between Plaintiff's activities and the decision to charge Plaintiff.

Once again, the Court need not resolve, and is in fact barred from resolving, these questions, because the § 3020-a Decision and the subsequent New York Supreme Court Decision conclusively resolved (at least) the latter issue against Plaintiff. Indeed, the Hearing Officer's written decision explicitly "reject[ed]" Plaintiff's argument that he was "charged in this proceeding in retaliation for having raised concerns about environmental hazards in his classroom." (§ 3020-a Decision 65.) The Hearing Officer further explained that there was "no evidence to support that argument," and that "[i]t was Plaintiff's insubordination . . . that led to his being charged, not his having raised concerns about a potential environmental hazard." (*Id.*) Moreover, on appeal, the New York Supreme Court specifically rejected Plaintiff's argument that the Hearing Officer failed to properly consider the issue of retaliation. (*See* Supreme Court Decision 3–6 ("Contrary to Petitioner's contention, the Hearing Officer did adequately address and reject the merits of Petitioner's retaliation defense.").) The issue of retaliation was, therefore, "clearly raised in a prior action or proceeding and decided against [Plaintiff.]"

*LaFleur*, 300 F.3d at 271 (citation and quotation marks omitted). Accordingly, collateral estoppel bars this Court from reconsideration of the issue.

Plaintiff counters by arguing that he should be permitted to raise the issue again because the legal standards for his retaliation *defense* in the § 3020-a proceeding are distinct from the legal standards applicable to his affirmative claims in the instant Action. (*See* Pl.'s Mem. 8–9.) In support, Plaintiff points to several cases where courts have held that a § 3020-a determination of "just cause" to terminate an employee need not preclude subsequent discrimination or retaliation claims. (*Id.*)

Plaintiff's argument fails for several reasons. First, while Plaintiff is correct that differing legal standards sometimes defeat issue preclusion, this principle applies to *legal* conclusion, not factual determinations. As the Second Circuit has explained,

> If the issues are merely [factual], they need only deal with the same past events to be considered identical. However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; different legal standards as applied to the same set of facts create different issues.

*Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 48–49 (2d Cir. 2014) (alteration in original) (citation omitted). Here, the Hearing Officer determined, as a matter of fact, that "[i]t was Plaintiff's insubordination . . . that led to his being charged, *not his having raised concerns about a potential environmental hazard*." (§ 3020-a Decision 65 (emphasis added).) In other words, the Hearing Officer not only determined that Plaintiff's termination was justified; he also determined that Plaintiff's complaints regarding mold were *not* a cause of his being charged.

Second, recent Second Circuit decisions (one of which was released after the Motion was filed) conclusively establishes that "but-for" causation is required for each of Plaintiff's claims. *See Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019) (requiring "but-for" causation for § 1983 discrimination claims); *Natofsky v. City of New York*, 921 F.3d 337, 348–49 (2d Cir.

2019) (requiring "but-for" causation for ADA claims), *petition for cert. docketed*, No. 19-732 (Dec. 10, 2019); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (noting that "but-for" causation is required for First Amendment retaliation claims); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (requiring "but-for" causation for Title VII retaliation claims); *O'Hara v. Bd. of Coop. Educ. Servs., S. Westchester*, No. 18-CV-8502, 2020 WL 1244474, at *15 (S.D.N.Y. Mar. 16, 2020) (noting that standards for Title VII and ADA retaliation claims are similar and "the ADA does not permit mixed-motive causation for retaliation-based claims" (citation and quotation marks omitted)); *Radice v. Eastport S. Manor Cent. Sch. Dist.*, No. 17-CV-1, 2020 WL 1041124, at *9 (E.D.N.Y. Feb. 5, 2020) (noting that but-for causation is required for § 1983 retaliation claims). Moreover, the Second Circuit has explained that, for the purposes of "but-for" causation, once a defendant has established the existence of a non-retaliatory reason for the adverse employment action, a plaintiff must "establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Naumovski*, 934 F.3d at 215. Here, Plaintiff is precluded from establishing any such thing. Indeed, the Hearing Officer already determined that it was "Plaintiff's insubordination . . . that led to his being charged" in connection with the conflict over Room 415, (§ 3020-a Decision 65), and further found that Plaintiff's termination was necessary based on years of gross incompetence and unprofessional conduct wholly unrelated to conflicts over Room 415, (Pl.'s 56.1 ¶¶ 228–51). In other words, the § 3020-a Decision has already conclusively determined that the Defendants' stated, non-retaliatory reasons for firing Plaintiff are both true and adequate. Accordingly, Plaintiff's retaliation claims—whether pursued under the ADA or § 1983, fail as a matter of law.

This conclusion is further bolstered by relevant caselaw. For example, in *Washington v. NYC Department of Education*, a district court acknowledged that in general "a finding of just cause for termination or discipline resulting from a § 3020–a hearing does not necessarily preclude the possibility that [a plaintiff's] termination was motivated by unlawful animus." No. 16-CV-9588, 2017 WL 4687982, at *7 (S.D.N.Y. Oct. 16, 2017) (citation and quotation marks omitted), *aff'd*, 740 F. App'x 730 (2d Cir. 2018). However, the court concluded that in *that* case "the identical issue of whether [the plaintiff] was discriminated against based on her disability was actually decided at her § 3020-a hearing, and such identity of issues is sufficient to satisfy the first prong of the collateral estoppel inquiry." *Id.* at *8. Indeed, the Hearing Officer's statement regarding Plaintiff, that there was "no evidence to support [Plaintiff's retaliation] argument," (§ 3020-a Decision 65), bears a striking similarity to relevant facts in *Washington*, where the court granted preclusive effect to the hearing officer's conclusion that "evidence of actual animus is weak," *id.* at *7 (record citation and quotation marks omitted). As the Second Circuit explained in affirming the district court's decision, "the hearing officer in the present case ruled decisively and specifically on whether [the plaintiff] suffered disability discrimination after considering the arguments from each side. . . . Plaintiff's discrimination claims are collaterally estopped by the factual findings of her [§] 3020-a hearing." *Washington*, 740 F. App'x at 733 (record citation omitted).

Although Plaintiff cites several cases where courts have held that administrative termination decisions do not preclude later claims of discrimination, (*see* Pl.'s Mem. 8–11), these cases are inapposite. Indeed, in each of these cases the court noted that the underlying administrative decision did not conclusively address (and reject) the plaintiff's claims of retaliatory animus. *See Matusick*, 757 F.3d at 48 (noting "there is no indication that the hearing

officer was ever presented with evidence that the charges against [the plaintiff] were motivated . . . by an intent to discriminate"); *see also Leon v. N. Y. C. Dep't of Educ.*, 612 F. App'x 632, 634–35 (2d Cir. 2015) ("There is no indication that the [§] 3020–a hearing addressed, much less 'actually decided,' whether the charges leading to [the plaintiff's] termination were driven . . . by discriminatory or retaliatory intent.").  Moreover, each of these cases applied a more relaxed "mixed motives" standard (rather than but-for causation)—either because the claims were brought under Title VII, or because they were decided prior to the decisive Supreme Court and Second Circuit decisions requiring "but-for" causation in § 1983 and retaliation cases.  *See Matusick*, 757 F.3d at 47–48 (inquiring whether the defendants were motivated "in part" by discriminatory animus); *see also Leon*, 612 F. App'x at 634–35 (inquiring whether defendants were "driven, even in part, by discriminatory or retaliatory intent").  Here, where the Hearing Officer expressly determined the issue and where the "but-for" standard is clearly established, there is no grounds for denying the § 3020-a Decision preclusive effects.

Accordingly, because an essential element of each of Plaintiff's retaliation claims (i.e., the issue of a "causal relationship" between the purportedly protected activity and the adverse employment action) has already been conclusively decided against Plaintiff, these claims "are barred by collateral estoppel and therefore dismissed."  *McGriff*, 2019 WL 1417126, at *6.[5]

### c.  State-law Claims

Finally, to the extent Plaintiff pursues NYSHRL or other state-law claims, the Court declines to exercise jurisdiction over such claims in light of the dismissal of all federal claims.

---

[5] The Court thereby dismisses Plaintiff's first (First Amendment retaliation), tenth (ADA retaliation) and twelfth (Fourteenth Amendment retaliation) causes of action.  (*See* Compl. ¶¶ 122–23, 132, 135–36).

*See Matican v. City of New York*, 524 F.3d 151, 154–55 (2d Cir. 2008) (noting that, where a court has dismissed all claims over which it has original jurisdiction, "it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims" (citation and footnote omitted)); *Ward v. Coley*, No. 18-CV-2382, 2019 WL 977887, at *8 (S.D.N.Y. Feb. 28, 2019) (same). Accordingly, Plaintiff's fifth, sixth, eighth, and eleventh causes of Action are dismissed.[6]

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment with respect to all of Plaintiff's claims, and accordingly enters judgment for Defendants.

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 38), enter judgment for Defendants on all federal claims, and close this case.

SO ORDERED.

DATED:      March 30, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[6] Plaintiff has agreed not to pursue his age discrimination and First Amendment "intimate association" claims. (*See* Pl.'s Mem. 2 n.1). Accordingly, these claims (Plaintiff's second, seventh, and eighth causes of action) are not considered, and deemed dismissed.